(158 App. Div. 414.)

LARKIN v. QUEENSBOROUGH GAS & ELECTRIC LIGHT CO. et al.

(Supreme Court, Appellate Division, Second Department. September 23, 1913.)

1. MASTER AND SERVANT (§§ 278, 281*)—ACTIONS FOR INJURIES—SUFFICIENCY OF EVIDENCE.

In an action for the death of a telephone splicer, caused by an electric shock while repairing a blow-out, caused by lightning or by contact with electric light wires, evidence held insufficient to show any negligence on the part of the telephone company, but, on the contrary, to show that the accident resulted from deceased's disobedience of the company's rules and carelessness in neglecting well-known precautions.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 954, 956–958, 960–969, 971, 972, 977, 987–996; Dec. Dig. §§ 278, 281.*]

2. MASTER AND SERVANT (§ 154*)—LIABILITY FOR INJURIES—FAILURE TO WARN.

The failure of a telephone company to warn a splicer, who was directed to repair a cable, that there was a burn-out in the cable, did not render the company liable for his death, due to an electric shock, where he learned this fact by his own observation before he began work.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 308, 309; Dec. Dig. § 154.*]

3. MASTER AND SERVANT (§ 278*) — ACTIONS FOR INJURIES — SUFFICIENCY OF EVIDENCE.

In an action for the death of a telephone splicer, due to an electric shock, evidence held insufficient to show that the company's rules as to testing cables for electric currents before making repairs and as to wear-

ing rubber gloves were habitually disregarded, or that splicing could not well be done with gloves.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 954, 956–958, 960–969, 971, 972, 977; Dec. Dig. § 278.*]

Appeal from Trial Term, Nassau County.

Action by Delia Larkin as administratrix of Michael Larkin, deceased, against the Queensborough Gas & Electric Light Company and another. From a judgment for plaintiff, and orders denying a new trial, defendants appeal. Reversed, and new trial granted.

Argued before JENKS, P. J., and BURR, THOMAS, RICH, and STAPLETON, JJ.

John C. Robinson, of New York City, for appellant Queensborough Gas & Electric Light Co.

Alexander Cameron, of New York City, for appellant New York Telephone Co.

John M. Ward, of New York City, for respondent.

BURR, J. On August 17, 1911, about 1 o'clock in the afternoon, Michael Larkin, who for five years previous to that date had been in the employ of defendant New York Telephone Company, sustained injuries from an electric shock which resulted in his death. In a common-law action his administratrix has recovered judgment for the pecuniary loss resulting therefrom against the said Telephone Company and the Queensborough Gas & Electric Light Company, and from such judgment, and an order denying a motion for a new trial, each of the defendants appeals.

No evidence was introduced by either defendant. We are required, therefore, to determine whether, upon plaintiff's evidence, either or both of defendants have been shown to be lacking in the exercise of reasonable care, and whether decedent was free from negligence contributing to the injury.

[1] The accident occurred near the intersection of Tanglewood Crossing and Ocean avenue in the village of Lawrence. At this point the Telephone Company had erected a pole, upon the cross-arms of which wires were strung, and which was known as pole No. 66. Upon another cross-arm upon the same pole, and a short distance above these, the Gas & Electric Light Company had strung two of its lighting wires, which were intended to and did convey a powerful electric current, sufficient, if discharged through the body of a man, to cause death. There was evidence that at about 5 o'clock in the afternoon of August 15th, during a heavy rainstorm, sparks of fire were seen in the branches of a tree through which the wires of both defendants ran, and near the pole in question. This fact was at once communicated to the Electric Light Company. We may remark in this connection that other evidence, offered by plaintiff, tended somewhat to discredit this testimony; but for the purposes of this appeal we shall consider the evidence in its most favorable light for plaintiff, and assume its accuracy.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

It does not appear that the Electric Light Company had done anything toward remedying the defect, if any defect existed, prior to the time of the accident. It does appear that in some manner the Telephone Company had learned of some difficulty at the point in question, for on the evening of August 16th Larkin, the decedent, was instructed to go the next day to the place "to clear a trouble." Larkin was known as a "splicer." There was another class of workmen employed by the Telephone Company, known as "trouble hunters." The distinction as to their duties is not entirely clear, but it seems to refer to the character of the repairs necessary. If the difficulty was in a single wire, the trouble hunter discovering it might repair it. If it affected a cable, or was of a more serious nature, other workmen were employed.

On the morning of August 17th, before Larkin was injured, a trouble hunter had visited the scene of the accident, found a burn in the cable carrying a large number of wires, and had reported this to the wire chief, who had instructed him to go on, and that he would report it to the cable department. Under such circumstances the splicers go and clear trouble by splicing and putting on some new pieces of wire. When Larkin arrived at the place in question, he climbed the pole and remarked to his helper, "It looks like a blow-out, Jack." This helper testified that:

"A blow-out is either caused by lightning, or by a high tension current coming in contact with one of our wires, blowing a hole in the sheathing. That is what we call a blow-out. This hole, we saw before we opened it up, was about the size of your finger nail; small finger nail. It was black."

The terms "blow-out" and "burn-out" seem to be interchangeable. Plaintiff's evidence is to the effect that:

"Going to a point and seeing a condition that is described by the term 'blow-out,' any telephone man or wire man of experience would know that a heavy voltage had got to that spot where the blow-out or burn-out appeared."

The rules of the Telephone Company, with which decedent was shown to be familiar, prescribed that each employé whose duties require it for his own safety to—

"supply himself, at his own expense, with spurs, body belts, safety straps, and rubber gloves. * * * Constant and extraordinary care shall be exercised in all situations where an element of danger is or may be present, as when working in the vicinity of high potential conductors. * * * Employé is warned that light or power wires, * * * carrying currents of dangerously high voltage, often exist in close proximity to the wires of this company; that contact with them or leaking of current from them is liable to occur by reasons of storm of all kinds, sagging or breaking of wires, defective insulation, dampness of poles and cross-arms, and other causes. Employé is also warned that apparently sound insulation on wires other than telephone wires is frequently insufficient to prevent serious and sometimes fatal results from contact therewith. * * * In all cases where the wires * * * referred to in this or the preceding paragraph are attached to telephone poles, or pass so near them, or telephone wires or cables, as to be within reach of the employé working on or about said pole, wires, or cables, such employé shall use safety straps, rubber gloves, and rubber boots. * * * where dangerous conditions exist, and particularly in cases where repairs are being made to telephone circuits that are in trouble, employé shall use said safety straps, rubber gloves, and rubber boots."

There was also evidence that, under circumstances such as are here disclosed, the first duty of a splicer, before making repairs, was to test the cable to ascertain whether there is any stray electric current in the wire. It is true that the witness who thus testified, and who was sent after Larkin's death to repair this cable, in response to a leading question by plaintiff's counsel, said that on this occasion he made the safety test, because he knew of the accident on the preceding day. But he afterwards testified that, without reference to the fact that a man had been injured, for his own safety he would make the test, when there had been a burn-out, and it appeared that Larkin was furnished with a "tester," which presumably was intended for use when occasion required. After discovering the blow-out, Larkin, without making any safety test, or putting on any rubber gloves, after opening the terminal box and taking the clamp off from the cable, proceeded with a tool called "splicing scissors" to cut the sheathing to expose the wires inside. While thus engaged, his helper heard a snapping sound, Larkin called out, "My God, John, I got it," and fell dead.

We fail to see wherein the negligence of the Telephone Company is established. The complaint alleges that it failed in its duty to provide decedent with a safe place to work and with safe tools and appliances, and neglected to promulgate and enforce reasonable and proper rules and instructions for the protection of its employés. There is no suggestion that any safer or more efficient tools and appliances could have been furnished than were furnished, or that more stringent rules could have been adopted. The danger surrounding the place where Larkin was at work was inherent to the nature of his employment. Mullin v. Genesee County Electric Light, Power & Gas Co., 202 N. Y. 275, 95 N. E. 689. He had been sent to make safe that which in the ordinary course of events had become dangerous, and his employment was for that very purpose.

[2] The learned counsel for respondent contends that the Telephone Company was at fault in not communicating to decedent the information which it had received earlier in the day, from the trouble hunter, that there was a burn-out in the cable. But Larkin knew this from his own observation before he began work, and no additional information could have been conveyed to him on that subject. The difficulty arose from his deliberate disobedience of the rules of his employer, and his own carelessness in neglecting well-known precautions. Sad as are the consequences, it would be unjust to visit these upon either of the defendants. Johnston v. Syracuse Lighting Co., 193 N. Y. 592, 86 N. E. 539, 127 Am. St. Rep. 988; McNamee v. Western Union Telegraph Co., 140 App. Div. 874, 125 N. Y. Supp. 622; Griffin v. New York Telephone Co., 141 App. Div. 1, 125 N. Y. Supp. 642; Geer v. New York & Pennsylvania Telephone & Telegraph Co., 144 App. Div. 874, 129 N. Y. Supp. 784. Another illustration is here afforded of the carelessness which often results from constant familiarity with danger.

[3] The learned counsel for plaintiff sought to show that the rule as to the use of the safety test and rubber gloves was habitually disregarded, and that splicing could not well be done with gloves. We

think that the evidence fails to establish this. One of the witnesses called by plaintiff, a splicer, after testifying on his direct examination that he had never seen any splicer using gloves, and that the work could not *very well* be done with them, admitted on cross-examination that:

"It could be done. The rule required us to do it. We used our own judgment as to whether or not we would obey the rule, or take the risk of not obeying it."

The other witness, who was a splicer's helper, and who testified on his direct examination that he had never seen splicers wear rubber gloves prior to the date of the accident, on cross-examination admitted that he did not know what the other men did. But in any event there is no evidence that this infraction of the rule, if it was of common occurrence, was ever brought to the attention of the superiors of those thus disobedient.

The judgment and orders should be reversed, and a new trial granted; costs to abide the event. As the record contains all of the exceptions taken by either party, and as no error is found in either of the rulings adverse to plaintiff, if plaintiff deems that it will facilitate a speedy determination of this controversy to direct judgment in favor of defendants, instead of ordering a new trial, application may be made to this court for an order to that effect. All concur.

---

(158 App. Div. 438.)

### GROSS v. LIDGERWOOD MFG. CO.

(Supreme Court, Appellate Division, Second Department. September 23, 1913.)

MASTER AND SERVANT (§ 270*)—INJURIES TO SERVANT—EVIDENCE—GUARDING MACHINE.

In an action by an employé for injuries received from a machine which was not guarded as required by Laws 1909, c. 36 (Consol. Laws 1909, c. 31) § 81, it was error to sustain objections to questions whether it was customary to guard such a machine, and whether it could be guarded and still have performed its work properly, since the answers might have shown that it was not practicable to guard the machine.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 913–927, 932; Dec. Dig. § 270.*]

Appeal from Trial Term, Kings County.

